We'll hear argument today in Case 18-13-34, the Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment and the Consolidated Cases. Mr. Verrilli? Mr. Chief Justice, and may it please the Court, the question in this case is whether members of the Financial Oversight Board are officers of the United States who must be selected in the manner that the Appointments Clause prescribes, or whether they are instead territorial officers who do not have to be selected in that manner. The Constitution's text, structure, and history in this Court's precedents all make clear that the proper focus in answering that question is the nature of the authority the Board exercises. It comes down to whether Congress has vested the Board with the executive power of the national government, or instead vested the Board with the territorial executive power. The statute that created the Board, Pro Mesa, answers that question in a straightforward way. It sets up an entity within the territorial government. It gives the Board only territory-specific authority and instructs the Board to pursue only territory-specific objectives. The Board acts on behalf of Puerto Rico as its representative in judicial proceedings to restructure the territory's debts. It pursues only Puerto Rico's interest in those proceedings. It's up to the Article III Court that adjudicates those proceedings to balance all the competing interests. Congress also instructed the Board to implement a method for restoring fiscal stability. That, too, is territorial authority. It reaches only Puerto Rico's budgeting and fiscal planning, and the Board must exercise that authority in a manner that protects Puerto Rico's vital interests. Now, Congress did build in protections to guarantee the Board's independence. Congress did that because it concluded that Puerto Rico's staggering financial and humanitarian crisis could not be solved unless the Board was insulated from the political pressures that caused that crisis in the first place. But Congress also insulated the Board from federal control. Board members can be removed only for cause, which means that the President cannot remove them based on disagreement with the Board's policies or priorities in implementing Pro Mesa. When you put all that together, the Board is in the territorial government. It's been given statutory directives to advance the interests of Puerto Rico, and it's insulated from federal control. It's clear that Board members are territorial officials, not officers of the United States. How can that be, Mr. Verrilli? It seems to me that your very argument that it's independent is suggesting it can't belong to the territory, and that there's a serious problem that the federal government is creating an entity that no one can control. Neither Congress nor the President can remove this entity for anything but cause. Tell me how this differs from a U.S. attorney. A U.S. attorney is an officer of the United States. I think you accept that. A U.S. attorney is enforcing federal law in Puerto Rico, the U.S. Attorney of Puerto Rico, just the way Pro Mesa is. And a U.S. attorney doesn't have jurisdiction outside of Puerto Rico. So how is the U.S. attorney different? So let me make a general point, and I'll specifically answer the U.S. attorney question. The general point, I think it's important to make clear, we don't say, contrary to our friends on the other side, that the Appointments Clause doesn't apply in Puerto Rico. It applies in Puerto Rico just like it applies in a state, in that federal officials,  they have to abide in conformity with the Appointments Clause, including the U.S. attorney. Could Congress pass a law like Pro Mesa for a state? No, I don't think so, because the difference between that situation and this situation is Article 4. And I really think that gets to the heart of the matter, Justice Sotomayor. But I think the beef that my friends on the other side have is not with the Appointments Clause. It's with Article 4. And the difference between this situation and a state is that Congress has reserved authority under Article 4 to alter the structure of a territorial government and to prescribe territorial law, its substantive territorial law. Could you give at least a quick answer to the first part of Justice Sotomayor's question? Yes, of course. The difference, I think, the key difference between a U.S. attorney and the Board is that the U.S. attorney is executing laws of nationwide application, the U.S. Criminal Code, Title 18, and the U.S. attorney in Puerto Rico in that respect is no different than the U.S. attorney in New York. The Board does not implement laws of nationwide application. It implements laws... But all laws don't have nationwide application, even federal laws. Some federal laws have local application as opposed to national. They're still federal law because they were passed by Congress and they're federal dictates. This is no different for the U.S. attorney. I do think it's different in a fundamental way, Your Honor. It is territory specific. It applies only to the territory of Puerto Rico, and the Board's authority is to act in the interest of the territory of Puerto Rico in their... Well, Mr. Verrilli, suppose that Congress looks at Florida and it says that there are a lot of hurricanes there and the waters are rising and we have a terrible Florida problem, and Congress passes the Florida Reclamation Act, and it's supposed to deal with the Florida problem that it perceives, but uses federal law to do so. Would you say that... I think your phrase was the executive power of the national government. Would the head of the agency that the Florida Reclamation Act sets up be exercising the executive power of the national government? Yes. And the difference is... I'm sorry, Your Honor. No, I was just going to say, what is the difference? And the difference is that Congress has dual authority with respect to the territories to act under Article I with laws of nationwide application, which are enforced by federal officials. For example, there's a FEMA regional administrator, there's an EPA regional administrator. They're all appointed in conformity with the requirements of the Appointments Clause, but it has dual authority. It can also act as a territorial legislature, and under Article IV it has plenary authority to do so. Well, how do we know which authority it's using? Well, you look, I think it was, we think Palmore is the relevant precedent there, and I think what you do is you look to two things. First, what does Congress say it's doing? Here, Congress said expressly, we're invoking Article IV, and we're creating an entity in the territorial government. That's the language of the statute. Entity in... The argument, Mr. Verrilli, you started with, this is an entity within the Puerto Rico government. The argument on the other side is, no, it's not within, it's above. It's above the Puerto Rican government, and it's above the legislature and the government. Yes, and that's simply an incorrect characterization. I think it misinterprets independence for superintendents, and I think if you think about it, it's just not right to say that what you've got here is a federal overlord or a federal master in the language of the First Circuit, because think about what Congress did here. First, it said that the board's authority is territory-specific, and then it said that the board is supposed to act on behalf of Puerto Rico and represent Puerto Rico in the restructuring proceedings. It's not supposed to advance the broad interests of the United States. It advances Puerto Rico's interests, and similarly with respect to its budget. Well, but wasn't Congress thinking about the broad interests of the United States? I mean, here it was. It was looking at this terrible financial crisis in Puerto Rico and considering a wide variety of options to address that crisis. Now, one option could have been some kind of financial bailout. Congress didn't want to do that. It instead chose an option that had less financial cost for the American people as a whole. So, you know, why shouldn't we think that Congress, in enacting this piece of legislation, was not thinking about it through a broad national lens? First, I think what matters is what Congress did, not what the motivations of individual legislatures were in moving forward with what Congress did. Second, the best evidence of what Congress did is the statute itself, where it made a choice to create an entity in Puerto Rico, and it instructed it to act on behalf of Puerto Rico. And even with respect to its budgeting authority, it said, when you do your budgeting and fiscal planning, you've got to ensure that there's adequate funding for essential services in Puerto Rico, adequate funding for the Puerto Rico pension plan, adequate funding for economic development in Puerto Rico. It told this board to act for Puerto Rico. And so what if we don't think it's an all-or-nothing division when you look at the responsibilities of the board? I mean, certainly much of it has to do with territorial issues, but you can certainly appreciate congressmen viewing this, obviously, as something with nationwide significance. So to some extent, it's dealing with territorial issues. To some extent, it's dealing with issues of broader national significance. What happens to your case in that? I think the answer is the same, because what matters is the power that Congress chose to invoke and the way in which Congress chose to act. And what Congress did here was tell the board the way to address this problem is by acting in the interests of Puerto Rico, and then it also insulated the board from federal control through the four costs. May I ask you, if we had the original act setting up the U.S. attorney for Puerto Rico and Congress changed only one label of the three Palomar factors, same factual situation as it is now, except that it says, we're doing it under the territorial clause. You're suggesting that that's enough reason for why? Absolutely not, Your Honor. And that's why the third factor in Palomar is the critical one. You have to look at the nature of the authority that the office is executing. All right, now let me ask you, how you can label this a territorial officer as opposed to a federal officer handling a federal mandate when none of the people of Puerto Rico have voted in any way on any of the directives that this agent has received? I understand that point, Your Honor. But again, I don't think that has anything to do with the appointments clause. There is no doubt under this court's precedence, starting two centuries ago and as recently as Sanchez-Bae, that Congress has reserved authority to act at the territorial level and to change the structure of territorial government and to change the substance. There's no point there. The issue is, where do you draw a line between what's a federal officer and what's a territorial officer? And the issue has to be that when Congress chooses, it's Congress's choice. If the territory chooses, if it elects a governor, if it elects legislature, if it elects its own attorney general, that those are officers that Puerto Rico has selected. But if the federal government is making the selection and imposing it on a territory, it has to be a federal officer. I think that's just not right on numerous levels, Your Honor. No, it's too simplistic for you. No, no. No, one of the main reasons why it's just not right, I think, is that it's not consistent with the history of this country. And if you start with the mayor of Washington in 1802, now, admittedly, it's the enclave clause, not the territories clause, but the court has said that there are provisions that should be read in the same way. If you start with that, the mayor of Washington was appointed, Congress created the position of mayor of Washington under a statute. I mean, that's one example. But the other side says the historical practice is otherwise overwhelming up until about the 1950s of saying that territorial officers had to be appointed by the president with the advice and consent of the Senate. So how do we deal with that historical practice? You do have the mayor example, so it's not uniform. But how do we deal with that historical practice? Two points. First, on the mayor, I think the mayor of Washington is an extremely significant historical marker because, after all, the presidents who made those appointments every year during that period were Jefferson and Madison. And if they had thought that the appointments clause applied in a situation like that, certainly we would have heard about that. I agree with you. But assume the history is still... But with respect to the history they have, essentially, is that territorial governors up until the 1950s were appointed with advice and consent. And judges. And territorial judges. But I actually think that... Let's go right to the judge's point because I think that actually proves our position and not theirs. Because even though territorial judges were always nominated by the president, confirmed by the Senate, this court held, starting in Cantor and then also in Engelbrecht and Macalester, that they weren't judicial officers of the United States, despite the fact that the president nominated them and the Senate confirmed them. And then, to reinforce that, there have been three times in the country's history where a question arose about whether a territorial judge could be impeached by Congress. And in each of those three instances, the political branches concluded that a territorial judge could not be impeached because the territorial judge was not a civil officer of the United States, but only an officer of the territory exercising territorial power. With respect to the governors, of course, the Appointments Clause is not an either-or proposition. If it applies to the governors as principal officers, it applies to the people the governor appoints as inferior officers. But starting with the Northwest Ordinance and continuing throughout the country's history, inferior officers have been appointed in manners that don't comply with the Appointments Clause. Does it strike you as a little strange, Mr. Varelli, to use the history in this kind of case so extensively? I mean, first, it's a little bit all over the map and you each have your historical examples to point to. But second, the position of territories currently is so different from the position of territories throughout much or most of our history. So I guess it seems to me more natural, rather than to look to, you know, what the Northwest Ordinance did, is simply to use a kind of functional test and say, are these people doing the sorts of things that would be done by state officials in states, or are they doing the sorts of things that would be done by federal officials? So two things. First, respectfully, we think in interpreting the meaning of the phrase officer of the United States, which is the job that has to be done in this case, the history is very, very relevant. But second, even if one takes a functional analysis, I think the right way to look at the functional analysis is to look at what the board is actually charged with doing. And what the board is actually charged with doing is acting in the shoes of the government of Puerto Rico and the restructuring proceedings, and acting as an independent entity, insulated from political pressure within the budgeting proceedings, but constrained by statute to act on behalf of, in the interest of, for the territory. So if we're going to use a functional approach that's very much like a state government, not a federal overlord, and I think this would actually be kind of a crazy system, if what you wanted to do was create a federal overlord to say, you're a federal overlord, take the national interest into account. But when you actually administer the authority you have, you have to only focus on territorial interests. What do we do about the brief of, at least there's one amicus that suggests that in one of the litigations that's ongoing with respect to PROMESA, that there's all sorts of evidence that the board is taking directives from federal officials? So, you know, that brief, you know, respectfully, Your Honor, I think that shows the perils of relying on an amicus brief that relies on extra record information. The vast majority of those, of the documents there, have not been disclosed. But if I may talk about them, because I've been asked about them, the vast majority of those are communications from federal government officials to the board in the wake of the disasters and the hurricanes saying, we need information about what's going on on the ground here. And so it was informational, the overwhelming majority of them. Now, they did find one communication from a Senate staffer, I think, or a House staffer, I think a Senate staffer, saying, we want you to resolve issue X this way. Again, I've got to be outside of the record to answer that. But basically, the board told them to pound sand. And so I don't think there's any merit to it whatsoever. Thank you, counsel. General Wall. Mr. Chief Justice, and may it please the Court. We know that Congress expressly invoked its authority over the territories and placed the board within the Puerto Rican government. So the real question here is, was that choice constitutional under Article 4? It was. The board budgets and restructures debt only for Puerto Rico. It acts in the territory under a territory-specific statute. In our view, Mr. Chief Justice, the board's focus is exclusively local. But at a minimum, it's primarily local, which is the appropriate test under Paul Moore. Justice Kagan, Congress could have legislated directly. It could have put this in the Treasury Department. If it hadn't otherwise specified, the powers would have gone to the assembly and the governor with respect to restructuring the debt and representing the Commonwealth in these Title III proceedings. It didn't want that. It wanted new and independent territorial officers on the ground in Puerto Rico to resolve the fiscal crisis as it had with the D.C. Control Board 20 years earlier. And what was the position the government took to the D.C. Control Board? So they point to a D.C. Circuit brief in the second set of proceedings. We said in that brief, after this court had held it's exercising federal power with respect to federal property, we said, sure, it's federal. But I urge the court to look at the brief. We said if it had been acting with respect to D.C., it would have been different because that would have been local power. I think the same is true with respect to the territories. We drew a distinction in that very brief between federal power over federal property and local power with respect to the district or here the territories. So I think our position has been entirely consistent. As early as 18- You don't see how. I mean, you say federal power over federal property, but that's what the territory clause read your way would say, that Puerto Rico is federal property. You can't have it both ways. So you have to be disposing of federal control over federal property because that's what a territory is. So I don't think so, Justice Sotomayor, but I don't know that much turns on that here. The Article 4 says both property and the territory, and this court's cases have treated them differently. So there it was Dulles and Reagan National Airports. Those have a different status under the Constitution from the territories. But I think my point was just that where Congress is acting with respect to something federal, it's exercising national legislative power and it's creating national executive offices. That's not what it's doing here. It put a board inside the Puerto Rican government. Now, yes, it wanted it independent from other Puerto Rican actors that it thought had played a role in this debt crisis. But that's a very different thing from putting it in the federal government and exercising federal power. It was reorganizing the Puerto Rican government. That is a quintessential exercise of Article 4 power. And I don't think, by the way, Justice Kagan and Kavanaugh, that the history is awash. It's not just the early Washington mayors. Territorial judges were federally appointed, never treated as federal officers. Early territorial upper houses, the D.C. control board. D.C. judges to this day are appointed by the president and confirmed by the Senate. They've never been treated as federal officers. They do not have lifetime tenure and a guaranteed salary. Federal appointment has never been the hallmark of whether you are federal or territorial. The hallmark has always been, as Mr. Verrilli said, what kind of power are you exercising?  VERRILLI, JR.: That's a good question. I mean, you're representing the federal government. If you lost, would they appoint the same people? MR. CLEMENT, JR.: The president has nominated the same people. MR. VERRILLI, JR.: Okay. Now, if that's so, and if you lose, but if we were to follow Judge Terea and say the de facto officer doctrine, what difference would it make?  CLEMENT, JR.: So there are two separate things with respect to the remedy, Justice Breyer. If the court agrees with us on the de facto officer doctrine, that takes care of the board's acts running up through the court's decision. Going forward, I think all the parties now agree we still need to stay with the mandate because you'd have to give Congress the opportunity to confirm a new board. Otherwise, the board would shut down overnight. You wouldn't have a board. So you've got to give the Senate time to act, right? And then that new board would pick up where the old board left off. MR. CLEMENT, JR.: But they would be the same people. And so what you're talking about is a delay of possibly days while the Senate gets its act together to confirm the people that they already recommended to the president, with one exception. I mean, is that what we're talking about? You win, and there's no delay. You lose, assuming Judge Shara is right, and there's a slight delay. That's what this case is about, on that assumption. MR. CLEMENT, JR.: I hope we're not in a world where we lose. And I would love to tell you that it won't be a big deal in that world. But it's going to be a little more complicated than that. They're almost certain to argue that the nominations have expired and that even though the Senate has confirmed people before to expire terms, it can't do that here. Even if we win that argument, and even if the Senate committee reports them out, and and we get a new board, then they're going to argue that board has to ratify everything that was done during the period of the stay, and they're going to challenge that ratification. And of course, that ratification will extend backward in time, further and further, depending on what you do with the de facto officer doctrine. So, I mean, we're going to be litigating this for years on that view. It's just a question of how much we're going to have to litigate with them if we're – if the court decides we're wrong on the merits. MR. SOTOMAYOR, JR.: Mr. Will, do you have to still litigate that here? You're making an assumption that the de facto doctrine does go as far as we say, which is to deprive a winning party of no remedy whatsoever.  WILLIAMS, JR.: That's not true. They will get prospective remedy, as all of the litigants did in the de facto officer cases, including Buckley. Second, this court's stay expires. The board can no longer act with respect to Aurelius, Assured, UTI, or anybody else. What the de facto officer doctrine says is even though you get meaningful prospective relief, we don't invalidate everything done moving backward in time that the officer is alleged to have done while invalidly appointed. And so – and I think that's critical here because the board's been acting for three years. We have, you know, nearly 100 adversary proceedings, hundreds of thousands of claims, hundreds of millions of dollars collected or paid out, $12 billion in bonds issued in the Cofina Title III proceeding that have been traded on the secondary – on the market something like 85,000 times. I mean, I have no idea how one unwinds this. And I don't think that Aurelius and UTI are given any real way to do it. And that's exactly what the de facto officer doctrine is for. We don't wipe everything out in the past. But I do want to say that I don't think we get to that. I don't think the merits here are close. Congress did its homework.  It told us where it was putting it. MR. BROWN, JR.: I thought your argument would be that if you lost, there would also be a calling into question the status of elected governors, judges, territorial judges, and the like. Is that not the case? MR. BUCKLEY, JR.: Well, I think it depends on which of their four or maybe five tests you pick. They start with Buckley. If they're serious about that, just significant authority under federal law, that's the D.C. mayor, city council, the Guam and Virgin Islands governors, and all territorial legislators and judges. All of that authority flows directly from federal law, whether an organic act or the D.C. Home Rule Act. So then they tweak Buckley to say, well, not if you're elected. And then I say, well, but you still don't solve D.C. judges, territorial judges, Washington mayors, early territorial upper houses of the D.C. control board. And then they say, well, it's executing federal law. Maybe it's a special law. Maybe it's federal objectives. Maybe it's federal removal. And there's a hodgepodge of other factors thrown in there. If the court accepts those, notwithstanding that there are historical counterexamples to every one of those tests, then I suppose you could try to carve out the test in just the way as to pick this up. But I don't think there's any principled way to do it. All of the federal authority that these territorial officers and D.C. officers exercise flows from federal law. And if you take their test seriously, yes, Justice Kavanaugh, it will threaten to undermine. Indeed, I think it would condemn in its entirety home rule. And that just points out, I mean, there's both an upper level and a lower level disruption here. The lower level disruption is undoing three years of what the board has done to try to The upper level disruption is every test they've got run smack dab in the history and every test they've got would federalize some number of officers who have always been thought of as territorial or local, whether in D.C. or in the territories. And like I say, I mean, from 1802 to now, I mean, if if if Mr. Olson is serious that significant authority under federal law makes you a federal officer, well, then so to the D.C. judges who at the immediate that you're looking at the ultimate source, which is a double jeopardy idea. And our and our opinion in Sanchez Raja made it very clear that it was limited to that much different result if you limit it to what's the immediate source. Oh, yes. I don't disagree that that's kind of an ad hoc limitation that they've thrown on to try to define what you said a little bit, Justice Sotomayor. What what I took Justice Kagan's opinion to be saying in Sanchez is, look, there are other ways you could have defined sovereignty or you could have looked at sovereignty. But if we're looking at source of authority, the source of authority here flows from federal law. Well, their test is a source test. Their test is Buckley. Did you get significant authority from federal law? So maybe there are other tests they could have tried to come up with. States, the Constitution is the source of their power because the compact with the United with their very existence is dependent on that. But we don't define what a state act is or a federal act by their original source. Oh, well, we define it by who passed the law, the state or the federal government. Well, except that under their test. And I think under Sanchez Valle, you've got to look at where that power flowed from. Where did you get that authority? And they keep saying authority under federal law. OK, well, if that's your test, all of that authority, whether with respect to D.C. or the territories, flows from federal law. And of course, the problem with the test, Justice Sotomayor, Buckley is a significance test. It takes an officer who's got conceitedly federal power and says how significant is their power? Are they an employee or are they an officer? It's not designed to answer the predicate question of, well, are they exercising federal power or territorial power? That's the question that Pallmore gets at. Is it a D.C. court or is it an Article 3 court? And the only way you know that is by asking two questions. One, did Congress invoke Article 1 or did it invoke Article 4? And then two, did it do anything under Article 1 or Article 4? Why do you bother with the third? If you give the first, assuming that, as your adversary said, if Congress, all it has to do is wave a magic wand, Article 4, and that that gives permission? Obviously not. Oh, it's still got to be, it's got, first you've got to ask where it was trying to put the office. That's the first step. And then you've got to ask whether it had the constitutional power to do that thing. Did it do something under Article 1 or under Article 4 that it couldn't do? And the very first sentence of the Court of Appeals discussion is, no one here has claimed that anything in PROMESA extends beyond Congress's reach under Article 4. And that's true. There's not a word in these briefs from Aurelius or Utier claiming that there is any power vested in the board that is not among Congress's plenary power under Article 4. That's the end of the analysis I think correctly understood. What was Congress doing? It was putting it in the territorial government. Did it give it any power it didn't have under Article 4? They haven't claimed that it did. That, under Palmore, I think is the end of the analysis. Congress invoked its plenary power. It didn't do anything Article 4 didn't give it the power to do. And Mr. Will, what is your answer to the question that Justice Sotomayor started off with about the difference between these board members and a U.S. attorney? It's the same one that Mr. Rooley gave, which is where you have executive officers who are acting under statutes of nationwide application, we think that that's best understood to be exercising federal executive power. Instead of setting it up the way it did, it just had amended Chapter 9 of the federal bankruptcy laws and said Puerto Rico instrumentalities get to use Chapter 9 the way everybody else does, then creates the board to do that. I don't think the form of that matters. You're asking the same two questions. I guess what I was suggesting was that on that, there would be a uniform national law. I think you'd have to ask the same two questions. Was Congress doing that under the bankruptcy clause in Article 1 or doing it under the territory clause in Article 4 to just create or extend those laws to the territory? And then did it put any powers in that office that it couldn't have under Article 4? So I think it'd be the same answer if when extending the bankruptcy statute, it had said we're extending a similar system to Puerto Rico. We're invoking Article 4. We are creating this new board to oversee these new bankruptcy proceedings, and we are putting that in the Puerto Rican government. Well, then it doesn't seem to have much to do with whether the law is nationwide or not, because my hypothetical was nationwide law, and you're saying it wouldn't matter because Congress said it was using Article 4. But it's got to be more than what Congress said, right? So I think that is pressing at exactly the tough question, which I'm going to say, unfortunately, is not presented here because it's a territory-specific statute, and it's only acting in the territory. But Palmore does say primarily local, and it's a little tough to figure out exactly what it means. It seems to think that if you're doing the D.C. code most of the time rather than federal statutes most of the time adjudicating, you're local, which seems to point up that you can do a little bit of the nationwide thing without converting into a federal officer. And we know that's true of territorial judges. That's the best historical example. They were hearing matters in the territory, but they were adjudicating them under federal law. So I think that you're asking a really tough question about, well, what does local mean? Does it mean you're doing only the local matters, or does it go to the geographic scope of the statute under which you act? I think it's tough. Palmore seems to indicate the scope of the statute might matter. History seems to indicate it might not if what you're doing is local. And again, all I can say is I think this is the easy case, because here we've got both boxes. Although this case isn't all that different from my hypothetical, right, because essentially what PROMESA does is it replicates all the procedures of Chapter 9. I mean, it's not coming up with a new thing. I mean, it's similar in most respects, but I actually don't think that changes the analysis. I mean, when the Detroit mayor walks in under Chapter 9 and files for municipal bankruptcy, we don't think that simply because he has invoked some power granted to him by federal law that he becomes a federal officer. I mean, here the board basically represents the Commonwealth. It's almost like the debtor. All it does is if the Commonwealth says restructure our debt, it walks in and files the petition in federal court. It then basically represents the debtor, not different from any other state or municipality, tries to work out the claims of the creditor, and then ultimately Judge Swain has to sort out the plan and confirm something in the bankruptcy. So I don't think in that respect it's acting any differently from any state or locality that declares under Chapter 9. It's still, under Palmore, it's still focused on local matters. Everything the board is doing, it's doing in Puerto Rico, which is why I don't think they've tried to claim, look, you needed any Article 1 power. All you needed was Article 4. Suppose Congress invokes Article 4 and puts it in the territorial government, as it's done here, but assigns some matters that, to pick up on Justice Kagan's questions, are more national than local. Is the remedy for that problem to say that that officer can't perform the more national duties, or is the remedy for that to say that the office is invalid because appointed in violation of the Appointments Clause? Well, first, Justice Kavanaugh, I don't want to grant that that office would be unconstitutional. It's pressing at the tough question Justice Kagan was getting at. So what does Palmore mean by primarily? It seems to leave some room to do nationwide or federal things, as long as you are focused on the territory. But if you assume that it's got to be exclusive, a test that I think we meet here, I think it's a hard question what the remedy would be. I think you'd still have the de facto officer potentially going back to the side, unless it's an adjudicator. I'm asking a different question. Wouldn't the officer still be a valid territorial officer, but perhaps exercising some duties that he or she cannot exercise? I think that's a potential remedy. We haven't looked at that here. We haven't briefed it. I do think that it highlights the oddity of the other side's claim. It's not as if they're pointing to some federal power provision. I think it highlights the difficulty, as Justice Kagan said, of the primarily local, because the word primarily, you're very careful in your brief to have that each time you articulate the test. And I'm not sure how we're supposed to figure that out. Justice Kavanaugh, I think you need it there. We've known since Cantor in 1826 that territorial judges are not federal officers. And yet, they are adjudicating cases under federal law. They had general federal jurisdiction, just like state courts. It was exclusive until 1875. So I think you've got to have some primary test in there. I think you're going to have difficult cases at the margins. And all I can fall back on is, this is not a difficult case, because here, there's nothing in PROMESA that needed to be an exercise of Article I. By its terms, it is limited to the territory. It's not as if they can point you to some federal provisions of PROMESA that grant the you could just excise. It says, represent the Commonwealth in the following ways. And I do, and I think this is the best way to capture it. Congress could have given these powers to the governor and the legislature. They already had many of them. They could adjust debt. They could propose budgets and fiscal plans. The governor otherwise would have represented the Commonwealth in the Title III proceedings. If they had created the Title III proceeding, but not otherwise specified that the board would play a role, and the governor had filed this petition, I don't think anyone believes that would have converted the governor into a federal officer, any more than the mayor of Detroit or anybody else. To say just a quick word on the remedy, as we tried to say, I think there are two things at play, the de facto officer doctrine. To be sure, you have not applied it to adjudicators. That's Rider. But you have more than a dozen cases applying it to legislative and executive bodies. That's Buckley. This is an executive body that's not doing adjudication, right? So I think it falls squarely within that set of cases. And indeed, I think it's sort of a classic case for that, given the immense reliance interests that have been built up on the board over the next three years. Going forward, everybody agrees we need to stay in order to confirm a new board if you decide we're wrong on the merits. I think the right model there is Northern Pipeline. That was six months. Same thing here. You've got to get them out of committee. You've got to get them through the floor. They're going to have to do some amount of ratification. And then they're going to have to act going forward. At a minimum, though, I'd say we need three months with the ability to come back and report progress just like what we did in the First Circuit, because we've got to allow Congress and then the board some time to act. If the board is shut down in Puerto Rico, I do think it imperils a process on which we have made really substantial gains in the last three years in trying to stabilize the island's finances. And I can't stress to the court how important it is that the board be allowed to continue to do that work. Thank you. Thank you, General. Mr. Olson? Thank you, Mr. Chief Justice, and may it please the court. In Federalist 48, James Madison anticipated what Congress attempted to do with the PROMESA Oversight Board. Masking, under complicated and indirect measures, its encroachment on coordinate departments, drawing all power into its impetuous vortex, he urged all precautions against the enterprising ambition of this department. PROMESA was a response to a national financial crisis affecting millions of American citizens, including three million American citizens in Puerto Rico. The PROMESA board is appointed, supervised, and removable by the President of the United States, reports regularly on its budget and decisions to federal officials, and makes recommendations, it's required to do so under the statute, for changes in PROMESA and other federal laws. It presides over the largest municipal bankruptcy proceeding in United States history, managing over $100 billion in indebtedness, 165,000 claims, including over 200 clawback actions, lawsuits against major financial institutions, in a proceeding in an Article III district court designated by the Chief Justice of the United States. The board was effectively chosen, these are the words of the Congressional Committee, effectively chosen by members of Congress, all without the advice and consent of the Senate. The appointments clause is central to the separation of powers, without which, in the words of the framers, we have the very definition of tyranny, it was a response to the most insidious and powerful weapon of 18th century despotism. If the board were elected, would it be constitutional? No, it would not be constitutional, because, how, and, and... Doesn't that mean the Puerto Rico governor election is unconstitutional as well, then? No, because the Puerto Rican authorities that are given to the Puerto Rican governor and under the Puerto Rican legislature, are primarily local activities. I just described what the PROMESIS board powers are. They are national in scope. They bring cases in federal court against U.S. citizens. They conduct an extensive investigation of the oversight, over the underwriting practices, the bond rating situation with respect to this. All on behalf of Puerto Rico and its people and its agencies, the board is instructed to act not on behalf of the United States, but on behalf of Puerto Rico in pressing these claims. Justice Ginsburg, it is not on behalf of Puerto Rico. It is not an internal Puerto Rican operation. It is an oversight board. This board has the power to prescribe a budget for Puerto Rico. It has the power to veto decisions of the governor of Puerto Rico and the legislature of Puerto Rico. It has the power and has sued the governor of Puerto Rico and Puerto Rican officials. It's called an oversight board because it is not internal to Puerto Rico. Well, but it's oversight concerns, every sentence you just said there, it's of Puerto Rico, of Puerto Rico. Its focus is on Puerto Rico. Yes, the activities, as things in any of the territories often do, has broader impact. I'll get back to the question I asked your friend, Mr. Verrilli. What if we, I mean, I think it's very artificial to look at this and say, is this local or is this national? It obviously is some of each, or even the local aspects certainly have national implications. So again, I mean, where do we, I know what your answer is, but you could explain it. What do you do with, what do I do if I view it as some of each? Well, it is overwhelmingly a federal problem dealing with a federal issue. In the Lea de Tamaco case, just in 2007, with an issue involving insolvency or potential insolvency of Guam, this court said, this is not a local problem. This is, the insolvency of a territory is a national issue, it's a federal issue. The concern of the United States, this is, in a sense, a little bit like the LeBron case or other cases where this court has said the Congress is dealing with a significant federal problem. It has come up with a federal solution. It has given this board powers over citizens all over the United States. But I think the response on the other side is that they've taken some of the powers and given them to the governor and to the legislature and given them to the board. And the governor, as you acknowledged, is elected, not appointed consistent with the appointments clause. So is that wrong that they've taken the powers from the governor and legislature and given them to the board? They've taken all of the powers with respect to the financial situation in Puerto Rico and given it to the federal created board, which is appointed by the president, removable by the president, and has supervisorial authorities under the various statutes. I think the question is, but for this statute, who would be doing these activities? And if it would be the governor of Puerto Rico, doesn't that tell us something? The governor of Puerto Rico does not have the power to do these activities. Understand that. But for the statute, who would? Wouldn't it be the governor? No, but for the statute, this authority... That's what your colleagues suggest. And if that's erroneous, could you direct us to who would do it, but for the statute? The statute was created because the governor of Puerto Rico, there was no authority for officials in Puerto Rico to do these responsibilities, to bring these actions, these actions against the financial institutions in the mainland, to bring, to overturn the budget, to do these various things, to bring suit against the governor in himself. Why couldn't they? They'd pass a law, a Puerto Rican law, which would give them authority to do it. They would not have the power to have the reach that this PROMESA... What? Give me an example. I mean, if the legislature and governor wanted to do it, they would pass a law. They would represent Puerto Rico in the bankruptcy proceeding. They would take care of the problem. That case was before this court just a couple of years ago. The case involving whether or not Puerto Rico could use the bankruptcy statutes to do... No, no, no. I'm saying we set up a... What I think you're being asked by several of us is look at all the powers that the board has. Aren't they powers that the Puerto Rican government could exercise if it had the legislative and gubernatorial will? I submit, which one couldn't it? I think virtually all of them, Justice Breyer. This is a long statute prescribing an enormous range of powers, given the ability to overturn decisions of the governor to reverse... I understand that, but I don't want to repeat my question. You see what my question was. I do see what your... Mr. Olsen, I think the basic question, if I can simplify it, I believe, is couldn't the governor of Puerto Rico and the legislature have created their own fiscal rescue plan? Yes. Correct? No. I don't believe so. Why? I think that was the case that would give the authority to adjust debts, to accommodate the various different creditors to... Oh, you're talking about... We are... Okay. Okay. I guess your tension is that without PROMESA, the bankruptcy law wouldn't have changed to permit Puerto Rico to file its actions. It would not. And this statute went far beyond the bankruptcy powers. The powers that are given to this board are vastly greater than powers that are available under... So what you're basically saying is without this federal law creating this structure, the structure itself couldn't exist under existing law? That's correct. Just as the legislature couldn't do it. That's correct. Mr. Olsen, are you and your client here just to defend the integrity of the Constitution or would one be excessively cynical to think that something else is involved here involving money? And if so, what is it? What did the board do that hurt your client? Well, aside from the constitutional right to an officer... To defend the Constitution or do you have some kind of a concrete grievance? The process is not complete, Justice Alito. The process is ongoing. My client is being subjected to a process that is governed by officials that were appointed in violation of the separation of powers. So that, since it isn't complete, we can't describe the degree to which someone might have been hurt. But this court said over and over again that it's fundamental that an officer of the United States must be appointed pursuant to the Appointments Clause. That is fundamental to the separation of powers, which is fundamental to the Constitution. You don't have to answer this if you don't want to, but there is no money issue involved here? Of course there is. What is it? I'd just like to know what... This is a real case. I'd like to know what's really going on here. Well, there's over $100 billion of indebtedness being adjudicated in various procedures, a lot of which... Right, and your client wants more than somebody else you think is getting too much. So what is it exactly, if you want to answer? We can't possibly answer that. There are these extraordinarily large claims which the agencies of Puerto Rico have defaulted on, have not been able to pay these claims. So yes, you're right. Of course it involves a lot of money, and the money is in a process that's being adjudicated by a federal district judge appointed by the Chief Justice of the United States. Didn't your client acquiesce in some settlement? There was a settlement of one small piece of it that had nothing to do with, at no time did my clients relinquish their constitutional claims or recede from them in any way. There was a small settlement with respect to a taxing authority where the sales tax went into an agency, and that part of it has been resolved. And we've agreed not to challenge, my clients have agreed not to challenge, that settlement in any way. So that's a bit of a... But Mr. Oswald, you have agreed to challenge, and why? You are challenging. Pardon? What is the difference between what you agreed to, and you're not challenging, and now what you're challenging? What we're challenging is the remaining part of the procedure, which is the giant part of it. This is a small piece of it that was settled in some way, and there was really basically no choice, because the board was ongoing, and the settlement was reached with respect to a small segment of the resources. But in no way did my clients relinquish its constitutional rights to an appointment under the appointments. I see that. I want to ask you a question. I think you may... I'm sorry. Justice Ginsburg? That confuses me about your presentation, because you sought out very strongly that the evil here is Congress aggrandizing itself, Congress aggrandizing itself, at the executive expense. How about the member of the board that's appointed by the president alone? Can't be any question of Congress aggrandizing itself. Congress has given the president alone that authority. So would it be unconstitutional, in your view, if all of the members were appointed by the president, not subject to the advice and consent? I don't get how that... These are principled officers of the United States, not inferior officers. Therefore, principled officers, under the Constitution, must be appointed, nominated by the president... But what does that have to do with Congress aggrandizing itself at the executive expense? Well, the president appointed one without advice and consent of the Senate. That violates the appointments clause. The other were pursuant to lists. How about the D.C. control board, where they're all appointed by the president? That has never been adjudicated. The government itself, in connection with the D.C. control board, took the position, in an Office of Legal Counsel opinion, that that was a federal agency. There has never been a resolution of that. The D.C. control board has vastly more limited powers with respect to local matters, and our opponents bring up and rely on the Palmore case, which had nothing to do with the appointments clause. It wasn't an adjudication, or it wasn't a discussion of... They bring up home rule more generally, and that's a serious concern here, is if you were to prevail here, what would that do for home rule in the territories with elected governors? What would it do for the District of Columbia with the elected mayor, city council, the judges' appointments? How, if you were to prevail here, would the line be drawn so that it does not affect home rule? It would not affect home rule at all. Now, people might make the argument that PROMESA itself affected it in some way because it took over the responsibility of the Puerto Rican officials to set financial conditions, establish a budget, and all of those things. But the outcome in favor of my clients in this case would simply mean that the same officials would be appointed pursuant to the Constitution. It wouldn't change home rule. All of the cases that we've relied upon... But wouldn't it require that similar officials, maybe I'm not understanding, in the territories who exercise territorial power but also affect national power? I think the issue might be primarily federal power or versus primarily local. The Pelmore case itself, which our opponents rely on, repeatedly says in that opinion those were primarily or exclusively or largely, there's various different adjectives used in that opinion, local D.C. criminal proceedings, criminal law under the laws of the District of Columbia. And this Court has repeatedly likened the power that can be exercised in the territories under the territorial clause or under the clause that gives power over the District of Columbia, local territorial matters, the type of authority that may be given by a state to a local municipality. Congress enacts the D.C. Code, right? The D.C. Code is enacted by Congress. Yes. Well, it's changed over time, but at a certain point in time, yes. But the fact is that there is a difference between primarily local authority, and that's discussed in the Pelmore case. So that does sound like the test that is being used by Mr. Varelli and Mr. Wall. I mean, they've said that your test is kind of malleable. And I guess what I'd like to know, what is your test? My test is this Court's test, which was articulated in the Buckley case, again in the Lucia case. What struck me when I read that, when I read your brief, the Buckley test is significant authority pursuant to the laws of the United States. I guess what struck me was that on many occasions, you modified that test in your brief. You said significant federal authority pursuant to the laws of the United States. And when you do that, it strikes me that you're coming actually pretty close. I mean, and if you agree on a test, that seems not a bad thing. It seems as though when you say significant federal authority, you're coming pretty close to what Mr. Wall and Mr. Varelli have done. Well, we've looked at each of the cases that are cited both in our briefs and our opponents' briefs, including the United States briefs. It is, and it's a test of this Court, not just in the Buckley case, but as recently as a couple years ago, in the Lucia case. It's the same case. Right. Always to distinguish between officers and employees. And what I'm suggesting is that when you apply it to this situation, your own briefs modify the test by talking about federal authority and implicitly comparing federal authority to local authority. And we acknowledge that with respect to the test that this Court articulated repeatedly, Lucia was just the last time it did, that authority under the laws of the United States has always accepted the purely local authority that's been exercised in the territory. So if there's also exceptions for transitional governments, the Philippines, for example, there was a local government and then it was replaced. Mr. Wilson, I'm confused. I honestly don't understand what the difference between your test and the government's test is in this case. If you could articulate that in a few sentences, I'd be grateful. The test is difference between the two. Well, the difference between the two is that we believe, and what this Court has taught us, that if you're exercising significant authority under the laws of the United States, the laws enacted by Congress with respect to the government affairs of the federal government, as opposed to purely local, municipal, the speed limits. I understand the test. My question is what's the difference between that and the question asking whether the individual or the board? Is it acting primarily locally or primarily nationally? What's the difference? What is the delta? The delta is something that is a municipal matter. Does it have to do with local affairs, speed limits, zoning and things of that nature, as opposed to federal statutes that deal with a national crisis. This was a national crisis, a national... Could I rephrase that as asking whether the board was acting primarily locally or primarily nationally? The board is acting primarily nationally. Okay, so we do agree on a test then. Pardon me? So then we do agree on the test, right? Whether the board was acting primarily locally or primarily nationally. Well, that's a part of it, yes, because what this Court has said repeatedly is that where there is local, municipal authority, Congress has the power under Article IV to give government and regulate the affairs in... So it's primarily as... I don't want to ignore the de facto officer, but just to finish this, there's this nuance between you and your adversaries on, are you dealing primarily with a local matter? And they would say dealing with the budget, dealing with running the government, that's all local. You are attempting to say something different, but I'm not sure what that difference is, because when they use the words primarily local matters, that's the way I understand them to be using them. They can obviously correct me if I'm wrong, but they're saying this board is dealing with primarily local matters because it's dealing primarily with the budget. And that's not... That's... With all due respect, you cannot say that at the same time that you've read the PROMESA statute itself. And this board... Well, I've read it, but that doesn't mean I know what you're referring to. Could you succinctly make the difference between how you view primarily dealing with, in your way and the way the other side does? The insolvency of a territory of the United States is not a local matter. That's what this court said in the Liam Tiecho case in 2007. And that's what Congress was saying when it was dealing with the enactment of this statute. We have a fiscal catastrophe, a humanitarian crisis involving millions of citizens, three citizens all over the United States who are owed money by the government of Puerto Rico or agencies of the government of Puerto Rico. It's just a question of size. I mean, it's the same thing we're talking about, not Puerto Rico, but Ponce, I don't know the pronunciation, Puerto Rico, your position would be different, or a county in Puerto Rico. I think that it's possible that you could find a fiscal insolvency situation of a small enough unit of a portion of Puerto Rico where you wouldn't be talking about this. But Guam, which is what this court talked about in that case, Liam Tiecho case, was one four hundredth the size of Puerto Rico, involving a tiny fraction of the significance of Puerto Rico. So we're talking here about not just the size, but the dimension of the problem, the number of citizens that are involved, the number of creditors' claims, over two hundred clawback claims against financial institutions throughout the United States that are being pursued in federal court. This is a... So would it be right to say, Mr. Olson, that you view this statute as essentially a statute about debt restructuring? I mean, it has other aspects, and the board does other things, and oversees Puerto Rican budgets going forward. But you're saying that what we should do is look at the statute and say it's about restructuring a bankrupt territory's debt, and that that has to be viewed as national. Is that the theory? Well, that is part of the theory, as the United States repeatedly said with respect to, in the Freetag case, the deputy solicitor general was asked a question about what if the governor of Puerto Rico was appointed by Congress, or a federal official. And the response from the federal government was that would invoke, in every case, the appointments clause. Did that deputy solicitor general prevail on that position? That deputy solicitor general made a beautiful argument. And fortunately for him, the court did not decide that precise case. But that argument that was made is the same argument that the United States has made in 22 OLC, in 1978, when it was talking about Guam, in 31 OLC, in the brief in the Hechinger case, which was a follow-on to the Metropolitan Washington authorities case. That was a very, very important case. If we conclude that the powers and duties here are primarily local, and I know you disagree, but if we conclude that, do you lose? I suspect that if there's an agency in Puerto Rico that's dealing with purely local problems, like the article... You keep... I'm sorry to interrupt. You keep saying purely local? Well, primarily. I'll accept that's primarily. Okay. But there's a big... It may be a big difference, and it may be important in this case. Palmore case was talking about relative... It wasn't purely local, but it was primarily local. The court used exclusively, but I think the court meant in the Palmore case, those courts that were dealing with problems in the District of Columbia involving District of Columbia criminal laws. So the focus is on that. Of course, there are state officials that can enforce federal law. That's always been the case from the beginning of the Constitution. So it is primarily what's being involved here. This is the... The Congressional Budget Office itself looked at this particular statute and said, this is a federal office. The LeBron case that looked at Amtrak... Can I just try the question again? If we conclude it's primarily local, do you have an alternative argument, or do you lose? Well, I don't... I don't... I think that it can't conceivably be thought of as primarily local, given the scope of the authority. But I'm imagining a hypothetical situation where you might have a small unit of government, a subdivision of Puerto Rico that was purely a municipal problem. Yes, that could be a... That could not invoke the Complainants Clause. Wilson, don't lose the de facto officer argument. Yes. The de facto... This Court decided 24 years ago, unanimously, in an opinion written by the then Chief Justice, that when there is a decision, a challenge, a timely challenge to an Appointments Clause violation, one who makes, to use the words of that Court, one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case, and is entitled to a decision on the merits and whatever relief may be appropriate. I heard the government say, just a few minutes ago, that we've done all these things, we've made all those decisions. So put the Constitution aside, let us continue to do that. Let us have the fruits of the decisions that we made with unconstitutional officers who could never have even filed... I think that they are making a distinction between adjugatory and legislative decisions. I don't think... They seem to be saying that when it comes to legislative officers, that we have applied the de facto officer status. In more recent times, you're absolutely right. With adjudicatory officers, we have said, no, you have to give people a new hearing. So deal with that distinction and deal with why that's wrong. I don't think that there is a valid distinction in a vacuum between an adjudicatory process... The Lucia case was an administrative law judge that was exercising what the court perceived as partially adjudicative problems, but also conducting Article I activities, enforcing the laws of the United States. And this agency has that same authority that overlaps both. But if you write a case on which you place such reliance, if it was qualified, it says the defendant could object to the motive of appointment of the judge who adjudicates his case. And this board is not adjudicating any cases. The federal district court is. Justice Ginsburg, I would submit that this board is both adjudicating and enforcing laws in the same sense and has many of the same powers that the administrative law judge had in the Lucia case. And so that that distinction simply doesn't hold up. It's acting on behalf of the debtor agency in Puerto Rico. It's acting as a kind of a petitioner. It's not an adjudicator. That's one small part of what PROMESA does. That has to do with 165,000 claims. It doesn't have to do with overturning the budget, changing the financial structure of Puerto Rico, suing in federal courts citizens of the United States outside of Puerto Rico in connection with financial claims, clawback claims, they call them in the financial insolvency concept. If one were to look at all of the authorities, and I have to finish with the point that these officials are appointed by the President of the United States, an officer of the United States, removable by the President. And what this Court said in the Bowser case, that means that that's the official that they must fear and therefore obey, and is supervised in Section 2148, 2121, 2127, 2143. These are reports, recommendations, responsibilities that the Oversight Board must constantly give to officials of the United States, and therefore supervision. Thank you, Counsel. Ms. Mendez-Coburg. Mr. Chief Justice, and may it please the Court. I would like to address the issue of the Insular Cases, the remedy, and also some of the questions of the Court. If we stand in front of this building, we will see the words equal justice under law. The Insular Cases stretch that tenet into its breaking point. The court-made doctrine of territorial incorporation means that when my clients, and even myself, return to Puerto Rico, we will have a lesser set of constitutional rights than what we have standing here today. On the other hand, the First Circuit decided that my clients suffered a constitutional injury, but still they were left without a remedy. Equal justice under law should mean the same thing here in D.C. than in Puerto Rico. It should reject classifications grounded in ideas of alien races and savage people. It should also mean that when there is a constitutional injury, justice requires a remedy. Now, in this case, the First Circuit stated correctly that the Insular Cases hover like a dark cloud over this case. And it is true, because the opposing parties have been relying on the Insular Cases since the beginning of the proceedings to establish that even the structural provisions of the Constitution don't apply to the people of Puerto Rico. I think here everybody was agreeing that the Article I, Article II, does apply. And so, whether you have the Insular Cases or not, and I agree they're a dark cloud, but it doesn't matter here because the provision of the Constitution does apply. And I thought what was more, which I've been trying to work out, and you may have looked into this, is what about the Federal Relations Act? If in fact, you would be the one who might have thought of this, but it does give these powers, it's a deal. And the deal is the legislature of Puerto Rico and the governor do this. But there was a reservation. There was a reservation for the indebtedness. And that reservation was eventually repealed in 61. And when it was repealed, the legislature passed a constitutional amendment in Puerto Rico promising that they would pay creditors and that they had some priorities and so forth. Now, is that relevant? I've begun to think that the partnership, Estado Libre Associado, is more served by than considering it a federal law. Because if it's a federal law, it really is hard to reconcile with the FRA, but not so hard if it's a local law. Have you thought about it at all? If you haven't thought of it, forget it. I'm just, I have a tough problem in my mind on that. And if you have thought of it, I'd appreciate what you think. Well, Your Honor, we would forget about it. But the problem here is that actually what Congress did was to, yes, say that these are territorial officers, but it actually gave the oversight board powers that are not necessarily what the powers of a territorial officer are considered to be. The oversight board has the authority, as Mr. Olson mentioned, has the authority to file this bankruptcy proceedings, which is a federal power on behalf of the government, but also we see that they have the authority to impair contracts, which is something that wasn't mentioned before. Impair contracts even outside of the scope of the bankruptcy proceedings, which is in Title II of PROMESA. If the board understands that a contract made by the government of Puerto Rico with other parties is inconsistent with the provisions of PROMESA, it can even prevent the execution of those contracts. So that is a very significant power among the other powers that the oversight board has that not even the government, the local government of Puerto Rico has. Now, I do want to stress on the issue of the incident cases because it is important for the people of Puerto Rico and for my clients. This is a doctrine that has been 118 years, that has been good law. And here I want to stress that it is a matter of overruling the incident cases and the doctrine of territorial incorporation. It is a matter of constitutional and law, but also a matter of who the United States is as a nation. As Justice Breyer has pointed out, none of the other parties rely on the incident cases in any way. So it would be very unusual for us to address them in this case, wouldn't it? Well, Your Honor, they relied on the incident cases since the beginning of the proceedings. Actually, the unsecured creditors are still relying on the incident cases at this point. Now, it is very convenient for the other parties to rely on the incident cases in the lower courts where there is no authority to overrule these cases, but then when we come before this court to say that they are not relevant. Still, as I was about to mention, the incident cases comply with all of the factors that this court established in Janus, especially the quality of the reasoning because it is based purely on racial considerations to say that some provisions of the Constitution don't apply to the unincorporated territories because they are of a different race. That's the root of that doctrine. I thought the argument was that the Appointments Clause does apply to Puerto Rico, and the question is simply whether it's implicated on these particular facts with respect to this particular agency. Yes, Your Honor. I guess, again, I just don't see the pertinence of the insular cases. Well, as I mentioned, and also, last term, this court went ahead and overruled the Korematsu case in the Trump v. Hawaii case. The court said that the case had nothing to do with the Trump v. Hawaii case, but still, it was a morally repugnant doctrine that was purely considering the basis of race, and therefore, it was overruled. The same here with the insular cases, and I cannot stress enough that the parties have relied on the insular cases in this case. That is why it's the perfect opportunity to address them. Can I ask you a question about the duties of the board? If the duties of the board and responsibilities are considered primarily local, I'll ask the same question I asked Mr. Olson. Do you lose, or do you have an alternative argument? Your Honor, I don't think that the authority of the board can be considered purely local. I understand that, but if we conclude otherwise, is there an alternative argument, or is that the end of the case? Well, I believe that there is the example of D.C. judges who were still considered to be officers of the United States in the Wise case, so there are a couple of examples that this court could take. Now, I would like… Which D.C. judges are you talking about? I thought the judges of the D.C. Superior Court and of the D.C. Court of Appeals are not federal judges. Well, Your Honor, I'm talking about the Wise case, but still, the issue of the purely local affairs of the oversight board cannot stand if we look at the authority that it was vested on these officers through PROMESA. Now, I would like to address the remedy, because I think that it is very important for us to address that. My friends on the other side have mentioned the consequences of this case in terms of millions of dollars, but they have forgot about the impact to the people. What the opposing parties are asking this court to validate through the de facto officer doctrine is a certification of the fiscal plan, which is not subject to judicial review, that imposes austerity measures on the people that has impaired contractual obligations, including the collective bargaining agreement of my clients, stripping them of workers' rights like salaries, overpayment, and medical benefits. But also, we are talking about agreements with bondholders, with the PREPA, which is the UTIERRA's employers, that provides for the payment of the bonds ahead of the salaries, ahead of the contributions to the retirement system, and that it threatens the mere feasibility of such an instrumentality. We are talking about 7,000 labor claims that were stayed because of the Title III proceedings, proceedings that were filed at the sole discretion of the Oversight Board, and that were left without a remedy. And like I mentioned, the budget that established the policy for the government of Puerto Rico that it is done at the sole discretion of the Oversight Board, because we cannot say that the government of Puerto Rico has participation. If the board... You finish your sentence. Yes, thank you. If the board understands that the fiscal plan, which is the blueprint for all of these proceedings or the budgets, are inconsistent with them, I said the board can substitute for its own at its sole discretion. Thank you. Thank you, counsel. Three minutes, Mr. Verrilli. Thank you, Mr. Chief Justice. I want to make one overarching point on the merits and one point on revenue. On the merits, I want to go at the sum of each question. I think if you think sum of each, I don't think you can resolve it based on effects. And if you think about it, the effects we're talking about here are not the board's actions. It was the issuance of the bonds and then the default by the government of Puerto Rico, the elected representatives of Puerto Rico. So if it's effects, then they're officers of the United States. That can't be right. And it's just not an administrable test. It can't be whether they're enforcing federal law. Mr. Olson raised the Olympiaco case. That case proves our point. The statute he's talking about in that case requiring fiscal solvency is enforced by the governor and the legislature who are not appointed in conformity with the Appointments Clause but elected. So if he's right about that, Guam's government is unconstitutional. And it also would mean that the D.C. government from the beginning until Home Rule was unconstitutional because they were enforcing federal statutes. So that can't be right. It can't be based on the source of authority. They're really not arguing that anymore. And even if you wanted to accept the intermediate authority point and try to carve out Puerto Rico that way, it can't save Guam. It can't save the Virgin Islands. It can't save Home Rule in D.C. You basically blow everything else up if you adopt that standard, which is why they don't really advocate for it. So really it needs to be our test. Our test is one that's faithful to the text, faithful to the history, rests on principle, it avoids threats to Home Rule, and it's administrable. Maybe there are going to be hard questions on the margin, and we discussed those today. This is not a hard case. This is exclusively territorial authority. Now, on remedy, I think Mr. Olson's answer to Justice Alito's question tells you all you need to know about what's going to happen next. They brought this suit because they want a different board. They're perfectly entitled to do that, have every right to do that, but that's what they want, because they don't like the way this board is working out the debt problems. And so what you can be sure of if we're in the remedies phase, and I hope that we are not, but what you can be sure of if we are is that they are going to fight ratification by the board tooth and nail for years and years and do everything possible to keep this thing in a situation in which they have the hope to get a different board that will accomplish their objectives. So that's what will happen if we go down that path, and I would strongly urge the court not to do that. If you do reach the remedial issue, then I think the de facto officer doctrine, perfectly reasonable judgment, but more fundamentally, there is no reason to reach the remedial issue. Mr. Verrilli, let's say it is your test. Let's also say that the crux of this statute, there are some other things in it, but the crux of this statute is that it sets up a scheme for restructuring the debt of a bankrupt territory, and with the backdrop that that could not have been done under pre-PROMESA federal law by local officials themselves. Why is it primarily local? May I answer, Mr. Chief Justice? Two things. First, you wouldn't think that the mayor of Detroit was converted into a federal official because he took Detroit into bankruptcy under Chapter 9. He's still exercising local power. Same with the board. And second, again, the question, I think, has to be whose interest is the board advancing in that process? It's the court, the Article III court, that engages in the broad adjustment of interests here to achieve a nationwide result. The board's job, as the statute expressly says, is to act on behalf of the people of Puerto Rico and the government of Puerto Rico as its representative. It's an advocate for Puerto Rico, and that's why it's territorial authority. Thank you. Thank you, counsel. The case is submitted.